MARSHALL C. JOHNSON, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Springfield Court of Appeals, April 1, 1912.    Motion for Rehearing Denied June 3, 1912.

1. **RAILROADS: Employee Jumping from Moving Train: Defective Platform: Negligence: Contributory Negligence: Jury Question.** Plaintiff, while employed as head brakeman on a freight train, was injured on jumping from the engine to a station platform while the train was in motion, to get an order for the train. The petition alleged that a defective and decayed piece in one of the planks on the platform caused plaintiff to fall. The defendant set up contributory negligence on the part of the plaintiff in jumping from the moving train when he was not required to do so and when the platform was covered with frost which caused him to slip and fall. *Held,* that the question of defendant's negligence and plaintiff's contributory negligence were for the jury and that the court properly overruled defendant's demurrer to the evidence.

2. ————: **Operating Trains: Safe Place to Work.** The work of trainmen, not only while operating trains over the road but at station yards, is regarded as dangerous, even under the most favorable circumstances, and it is incumbent upon the companies to use reasonable care to make the places where they perform their duties as safe as is consistent with the operation of the roads.

3. ————: **Employee Jumping from Moving Train: Violating Rules: Jury Question.** In an action against a railroad company for injuries to an employee, a brakeman, who was injured while violating printed rules of the company, which prohibited the employee from jumping on or off trains moving at a high rate of speed, there was substantial evidence that the rules had been abrogated and a conflict as to whether the train was going at a high rate of speed. *Held*, the question was for the jury.

4. ————: ————: **Defective Platforms: Passengers.** When it is considered that the care required should be commensurate with the peril the employee encounters in jumping from moving trains, it may well be said that a platform that was not reasonably safe for a passenger would not be reasonably safe for such employee.

5. **MASTER AND SERVANT: Servant Violating Rules: Master's Acquiescence in Violation.** A servant cannot recover for injuries in consequence of the violation of the master's instructions or rules, unless it be shown that the rules were being violated with the knowledge and acquiescence of the master.

6. **RAILROADS: Employee Jumping from Moving Train: Defective Platform.** Where a railroad company knows that its brakemen, in the performance of their duties, were required to jump on to the station platform from the train, while the latter was in motion, then the condition of its platform is an important factor. The company was bound to know the usual effect of ordinary, natural conditions and to have contemplated that there might at times be frost or ice upon its platform and that on account thereof obstructions or defects in its platform might be more dangerous than at other times.

7. **MASTER AND SERVANT: Servant Selecting Dangerous Method.** An employee cannot hold the master for damages because he was injured while voluntarily doing an act which he knew was dangerous when at the same time a safe way was open and apparent to him.

8. **RAILROADS: Employee Jumping from Moving Train: Servant Selecting Dangerous Method: Jury Question.** Plaintiff was injured while jumping off a moving train to get a train order, the negligence alleged being a defect in the station platform. The evidence disclosed that it was the duty of the engineer to stop the train in case the train crew failed to get the order and defendant contended that plaintiff selected a dangerous way when a safer one was apparent to him. *Held*, that the question was for the jury.

9. **EVIDENCE: Negligence: Subsequent Repairs.** Testimony of subsequent repairs is not admissible to show negligence at the time of the injury.

10. ———: ————: ———: **Defective Board.** Where plaintiff claims that a board was rotten at the time he was injured, testimony that it was taken up a week afterwards and was rotten at that time was evidence that it was rotten at the time plaintiff was injured.

11. ———: **Defective Board: Confining Testimony to Defect: Harmless Error.** Where the instructions submitted to the jury the condition of the platform at the very point complained of by the plaintiff, the testimony of a witness, though objectionable for the reason that he did not confine his testimony to the condition of the platform at the point plaintiff was injured, is *held* not to have affected the verdict.

12. **INSTRUCTIONS: Master and Servant: Servant May Presume Place to Work in Safe Condition.** In an action against a railroad company for injuries to a brakeman, who in alighting from a moving train caught his foot in a defective board on a station platform, an instruction which tells the jury that in the absence of knowledge to the contrary, the plaintiff had the right to presume that the platform at the place where he alighted was in a reasonably safe condition, etc., is held proper.

Appealed from Barton Circuit Court.—*Hon. B. G. Thurman,* Judge.

AFFIRMED.

*W. F. Evans* and *Mann, Johnson & Todd* for appellant.

(1)  Appellant was not an insurer of its employees and was only required to maintain the depot platform in a reasonably safe condition; the evidence in this case fails to show neglect of this duty on the part of the appellant. Hutchison on Carriers (2 ed.), sec. 521; 4 Elliott on Railroads, sec. 1590; Gunderman v. Railroad, 58 Mo. App. 370; Robertson v. Railroad, 152 Mo. 382; Joyce v. Railway, 219 Mo. 344; Tabler v. Railroad, 93 Mo. 79; Gattis v. Railroad, 153 Mo. 403; Goranson v. Mfg. Co., 186 Mo. 300; Epperson v. Cable Co., 155 Mo. 346; Minnier v. Railroad, 167 Mo. 99; Luceke v. Graham, 123 Mo. App. 212; Lovell v. Railroad, 121 Mo. App. 466; Wendell v. Railroad,

100 Mo. App. 566; Warren v. Independence, 153 Mo. 595. (2) Not only did the burden rest upon the plaintiff to affirmatively prove negligence on the part of defendant, but furthermore it rested upon him after proving that defendant was negligent to also prove that defendant's negligence was not only the cause but the proximate cause of his injury. Killion v. Railroad, 86 Mo. App. 473; Cooley on Torts, p. 69; Foley v. McMahan, 114 Mo. App. 442; Kappes v. Shoe Co., 116 Mo. App. 154; Jackson v. Elevator Co., 209 Mo. 506; Reedy v. Brewing Co., 161 Mo. 523; Banks v. Railroad, 40 Mo. App. 464; Waller v. Railroad, 59 Mo. App. 410. (3) Plaintiff testified that before he alighted from the moving train onto the platform he looked and saw that the platform was covered with a heavy frost and saw further that the train was running at a rate of from six to eight miles per hour. His alighting onto said platform under such circumstances amounted to contributory negligence on his part, which would prevent a recovery. Hurst v. Railroad, 163 Mo. 309; Roenfeldt v. Railroad, 180 Mo. 554; Payne v. Railroad, 136 Mo. 562; Kelsay v. Railroad, 129 Mo. 362; Mockowik v. Railroad, 196 Mo. 550; Murphy v. Railroad, 43 Mo. App. 342; Heaton v. Railroad, 65 Mo. App. 479. (4) If there was any substantial evidence that it was plaintiff's duty to get off the train and secure the train order he knew that it was the duty of the engineer to stop the train when the order was missed. Under this condition of facts he had the choice of a safe or unsafe means of performing his duties and when he voluntarily adopted an unsafe way he absolved the defendant from liability. Moore v. Railroad, 146 Mo. 572; Hurst v. Railroad, 163 Mo. 309. (5) Because plaintiff's injuries were the result of disobedience on his part of the printed rules of the defendant company prescribing his duties at the time and place of the injury, with which rule he admitted he was familiar, and for this reason plain-

tiff was not entitled to recover. Matthews v. Railroad, 227 Mo. 241; Schaub v. Railroad, 106 Mo. 74, 23 L. R. A. 768; Francis v. Railroad, 110 Mo. 387; Van Camp v. Railroad, 141 Mo. App. 344; Yongue v. Railroad, 133 Mo. App. 158. (6) The court erred in giving plaintiff's instruction No. 7, which told the jury that the plaintiff had a right to presume that the platform at the place where he alighted was in a reasonably safe condition for him to alight. Palmer v. Railroad, 142 Mo. App. 440; Reno v. Railroad, 180 Mo. 483; Nixon v. Railroad, 141 Mo. 439; Bragg v. Railroad, 192 Mo. 331.

*Edwin L. Moore* and *Walter W. Calvin* for respondent.

(1) It was the duty of the appellant to exercise reasonable care to render and maintain its said depot platform in a reasonably safe condition for respondent's use in the performance of his duties. Henry v. Railroad, 109 Mo. 488; Burdict v. Railroad, 123 Mo. 222; Hollenbeck v. Railroad, 141 Mo. 97; Young v. Waters-Pierce Oil Co., 185 Mo. 634; George v. Railroad, 225 Mo. 364; Lee v. Railroad, 112 Mo. App. 372; Garaci v. Construction Co., 124 Mo. App. 709; Brannock v. Railroad, 147 Mo. App. 301; Munro v. Railroad, 155 Mo. App. 710, 135 S. W. 1016; Armour & Co. v. Russell, 144 Fed. 614, 6 L. R. A. (N. S.) 602; Railroad v. Sanders, 11 Am. and Eng. R. R. Cases (N. S.), 862; Southerland v. Railroad, 43 Fed. 646; Jarvis v. Railroad, 128 Mich. 61; Babcock v. Railroad, 150 Mass. 457; Bogenschultz v. Smith, 84 Ky. 580; Railroad v. Vestal, 12 Am. and Eng. R. R. Cases (N. S.), 635; Wichter v. Railroad, 46 Atl. 740. (2) The defective condition of appellant's depot platform was the proximate cause of plaintiff's injury. Bassett v. St. Joseph, 53 Mo. 290; Waldheir v. Railroad, 87 Mo. 37; Brennan v. St. Louis, 92 Mo. 482; Dixon v. Railroad,

124 Mo. 140; Vogelsang v. St. Louis, 139 Mo. 127; Smith v. Fordyce, 190 Mo. 1; Musick v. Packing Co., 58 Mo. App. 322; Waters v. Kansas City, 94 Mo. App. 413; Kansas City v. McDonald, 60 Kas. 481, 57 Pac. 123; Wheeler v. Fort Dodge; 131 Ia. 566, 9 L. R. A. (N. S.) 146; Koch v. Williamsport, 195 Pa. 488, 46 Atl. 67; Moore v. Townsend, 76 Minn. 64, 78 N. W. 880; Clinton v. Revere, 195 Mass. 151, 80 N. E. 613; Cole v. Society, 124 Fed. 113, 63 L. R. A. 416; 15 Amer. Dig. Dec., sec. 51, 20 L. R. A. (N. S.) 739. (3) The demurrer to the evidence was properly overruled; and the facts as presented warranted the submission of the issues to the jury. Erickson v. Railroad, 171 Mo. 647; Campbell v. Railroad, 175 Mo. 161; Walker v. Railroad, 193 Mo. 482; Deschner v. Railroad, 200 Mo. 327. (4) Instruction No. 4 given on behalf of the plaintiff properly declared the law; but in no event can appellant complain of error, if any, therein, in view of the instructions asked and given on its behalf. Noble v. Blount, 77 Mo. 235; McGrew v. Railroad, 109 Mo. 582; Spillane v. Railroad, 111 Mo. 555; Burdoin v. Trenton, 116 Mo. 358; Meadows v. Insurance Co., 129 Mo. 76; Anderson v. Railway, 164 Mo. 411; Meiley v. Railroad, 215 Mo. 567; Blaydes v. Adams, 35 Mo. App. 526; Wallich v. Morgan, 39 Mo. App. 469; Pike v. Eddy, 53 Mo. App. 505; Nichol v. Paper Co., 95 Mo. App. 226; Knudsen v. La Crosse Co., 145 Wis. 393, 130 N. W. 519, 33 L. R. A. (N. S.) 223; 19 Am. Dig Dec., sec. 295. (5) Under all the evidence it was a question of fact as to whether or not appellant had in force such a rule as contended for upon the trial hereof, and also, whether or not respondent at the time of his injury was in the performance of his duties pursuant to his employment. Berry v. Railroad, 98 Mo. 62; Francis v. Railroad, 110 Mo. 387; Brady v. Railroad, 133 Mo. App. 141. (6) The question of appellant's negligence and respondent's contributory negligence, as well as all other questions, upon the mate-

rial issues were properly submitted to the jury and under appropriate instructions; and no error, materially affecting the merits of this action, appearing those questions should remain conclusive upon appeal. R. S. 1909, sec. 2082; Barkley v. Assn., 153 Mo. 300; Jones v. Railroad, 178 Mo. 528; Peterson v. Transit Co., 199 Mo. 331; Mockowik v. Railroad, 196 Mo. 550; Stump v. Kopp, 201 Mo. 412; Berry v. Railroad, 214 593; Mann v. Doerr, 222 Mo. 1; Hannon v. Transit Co., 102 Mo. App. 216; Woody v. Railroad, 104 Mo. App. 678; Railroad v. Railroad, 110 Mo. App. 300; Caplain v. Transit Co., 114 Mo. App. 256; Cross v. Gould, 131 Mo. App. 585.

GRAY, J.—This is an action for personal injuries suffered by plaintiff at Richland, this state, November 20, 1910. He was head brakeman on a freight train, consisting of thirteen cars and a caboose, running from Springfield to Newburg. As the train approached Richland about nine o'clock p. m. a signal was displayed at the station which indicated there was an order for the train. The signal displayed indicated that the character of the order did not necessarily require the train to stop, but the operator could deliver it to the crew as the train passed the station. The plaintiff was riding on the engine and as the train approached Richland, he stationed himself on the steps of the engine to receive the order as it was handed up by the operator. He failed to get the order as the train passed the depot, whereupon he jumped to the platform and in some way was thrown and severely injured by getting under the train.

The petition alleged the duty and negligence as follows: ''That in the course of and as a part of plaintiff's duties, he was required, upon reaching a station where orders governing the movement of said train, were to be taken and received by the crew, to place himself on the steps of the engine cab, and in a

place where he could, while said train was in motion, reach said orders as the same would be handed up to him by the telegraph operator, whose duty it was to deliver the same to him; and, in the event that plaintiff would fail to catch said orders from said operator and agent, and if for any reason, he would fail to obtain the same while in said position, then it became and was his duty, in the course of said employment, to immediately alight from said train, procure such orders as were to be delivered to him at said station, and then board said train and deliver the same to the engineer thereon.

"That on said November 20, 1910, and at about the hour of 9:35 p. m., said train upon which plaintiff was working was passing eastward through the town of Richland, and, plaintiff, in order to receive the orders which were to be delivered to him at said station, had placed himself on the steps of the engine cab, on the north side thereof, and on the same side of said engine cab upon which the depot and platform were situated, but by reason of the fact that the operator, whose duty it was to prepare said orders for delivery to plaintiff, failed to have the same ready for delivery to him, and failed to present or deliver the same to plaintiff while he was in his accustomed position on the steps of said engine cab, and waiting to receive the same, while said train was moving past said depot and platform, it became and was necessary for plaintiff, in the furtherance of the duties of his employment, to alight from said engine cab and to obtain said orders and deliver them to the engineer as aforesaid which he thereupon attempted to do, and as he alighted therefrom to and upon the depot platform, while said train was still in motion, the heel of the shoe upon his left foot caught in a hole and decayed place in the plank or planks of said platform, by reason of which he was thrown forward and southward to and against the train and caused to fall between

said platform and said moving train, and was struck by the journal boxes and axles on the trucks of said train, and sustained lasting and permanent injuries.''

The answer was a general denial and a plea of contributory negligence. The plea of contributory negligence consisting of an allegation that plaintiff received his injuries in voluntarily jumping from the engine when and where he was not required to do, and that it was negligence for plaintiff to jump from the moving engine when he knew, or by the exercise of ordinary care, could have known, that the platform was covered with frost, and on account thereof, he was likely to slip and fall, and it was dangerous for him to jump on said platform under said circumstances.

The cause was tried before a jury, resulting in a verdict for $6000, and defendant appealed.

The first assignment of error is, that the court erred in refusing the appellant's demurrer at the close of the evidence.

The plaintiff testified that he was twenty-nine years of age, and had been railroading for ten years; that he had been running between Springfield and Newburg for two years previous to the time he was injured; that his work was on through freights which did no switching, and only stopped for orders and to meet and pass other trains; that on the night of his injury, he was the head brakeman, and reached Richland about 9:30 p. m.; that the train crew consisted of an engineer, fireman, conductor, rear brakeman and the plaintiff; that as they approached Richland, an order signal was out; that orders were known by their numbers, and that the signal denoted that a No. 19 order was to be delivered and which was supposed to be delivered by means of a hoop while the train was passing the station.

The following questions and answers are also found in plaintiff's testimony:

"Q. Now, on the night in question, you say the operator indicated the order was to be taken at Richland? A. Yes, sir.

"Q. What did you do at that time? A. I immediately got in position to catch the order, as was my duty and was accustomed to.

"Q. Did you receive that order? A. No, sir, I didn't. There was nobody there with an order.

"Q. What did you then do following that? A. I made preparation to get off just as quick as I could.

"Q. Describe to the jury what you did? A. Then I changed my lamp to my left hand, turned around with my back from the engine and my face towards the engine, and squared myself on the steps so as to swing off with my left foot.

"Q. As you got in that position just tell the jury what you then did? A. I lit on my left foot, and I slid about two or three feet, if I can remember. Then my left foot struck something like a hole, which caught the heel and held it there. Then my right foot—I put my right foot down just a little bit ahead of the left foot, and the force of the motion of the train leaned me forward, of course—pushed me forward, and being bent over in that position, and leaning towards the train the corner of the car commenced striking me in the shoulder; the force of the car striking me loosed my heel—I found afterwards it had torn off the heel of my shoe; then it carried me with the train.

"Q. Now, Mr. Johnson, tell the jury what your duties were as head brakeman, with reference to nineteen orders? A. My duties were, if I was on the engine and a nineteen order was to be handed on, to catch that order; and in case the order was not delivered, or missed by the engineer—if I were not on the engine and some of the engine crew attempted to get it and in any way failed to get it, then it became my

164 App.—39

duty to alight from the train and procure that order and bring it to the engineer.

"Q. Getting ·back on the train, of course? A. Yes; and get back on the train and deliver it to the engineer.

"Q. Would the train stop at those times? A. No, sir.

"Q. State whether you have performed those things in that manner before this injury? A. I· did; yes, sir.

"Q. For how long a time? A. Ever since I have been in the service of the company.

"Q. What were your duties as to where you was to ride at that time? A. Upon the engine.

CROSS-EXAMINATION.

"Q. The book of rules is a volume like that, isn't it? A. Yes, sir.

"Q. It was your duty to familiarize yourself with the rules, and you are familiar with the rules, are you not? A. Yes, sir.

"Q. The company requires that you take and familiarize yourself with the rules? A. Yes, sir.

"Q. Now, all the information that you had about your duties you got out of this book, didn't you? A. Yes, sir.

"Q. There is no other—the company had no other method of instructing you in your duties, excepting as to this book? A. Oh, yes; they have. They have bulletins in the assistant superintendent's office where brakeman are examined.

"Q. They give you a copy of the bulletin and post it in the assistant superintendent's office? A. Yes, sir.

"Q. There is no other source of delivering rules to you·by which you are to be governed in the operation of trains? A. No, sir; not that I know of.

"Q. I will ask you if you are familiar with rule 427, which reads: 'When approaching stations, junction points, draw-bridges, railroad crossings, water or coal stations, and while descending heavy grades conductors of all freight, mixed or work trains will require their brakeman to be out on top for one-half mile and until train comes to a full stop or has passed such point.' You were familiar with that rule? A. No, sir; it had never been practiced on the Frisco.

"Q. Don't you recollect of having seen that rule? A. No, sir; I don't recollect of ever reading it.

"Q. I will ask you to state if you remember this further paragraph? 'On trains fully equipped with air, front and rear brakeman should take position on high cars, dividing as nearly as possible the distance between engine and caboose. Where there are non-air cars, one of the brakeman must take position immediately behind the rear air brake car.' Do you remember that? A. Yes, sir; but those rules only applied on Dixon Hill and such like, on grades.

"Q. Were you familiar with that rule? A. Yes, sir. It applied to Dixon Hill and grades. It is not customary of practice of railroad company for a brakeman to ride on top any point only at Dixon Hill.

"Q. Doesn't it regulate it on approaching stations? A. No, sir.

"Q. I will get you to read rule 631? A. Each employee is required to be responsible for his own safety, as well as to exercise the utmost caution to avoid injury to his fellows. . . . The company does not require or expect its employees to incur any risk, from which, by the exercise of their judgment and by personal care, they can protect themselves, but enjoins upon them and demands that they shall take time and use the means necessary to, in all cases, do their duty in safety.'

"Q. I will get you to read rule 637? A. 'Employees are forbidden to stand on track and jump on

engine or cars as they approach them, and are warned not to jump on or off trains or engines moving at a high rate of speed, or to follow other dangerous practices.'

"Q. I will get you to read rule 204? A. 'Train orders must be addressed to those who are to execute them, naming the place at which each is to receive his copy. Those for a train must be addressed to the conductor and engineer, and also to anyone.who acts as its pilot. A copy for each person addressed must be supplied by the operator.'

"Q. I will get you to read rule 211? A. 'When a nineteen order has been transmitted, the operator, when it is completed, shall personally deliver a copy to each person addressed without taking his signature.'

"Q. Is there anything in the book of rules that says you should ride in the engine? A. I don't know as there is.

"Q. You say it was your duty to catch this nineteen order. Please turn to the book of rules and show where that is made the head brakeman's duty? Is there any such rule in the book? A. I don't know whether there is or not. I know that they have got it to do and if they don't do it they get disciplined for it.

"Q. You say it was your duty, should the attempt to get the nineteen order fail, it was your duty as head brakeman to get off and get it? A. Yes, sir.

"Q. Turn to the rule that makes it your duty? A. Them rules are not made by the book; they are bulletins issued by the assistant superintendent that a brakeman should do these things.

"Q. Mr. Yoakum was the assistant superintendent? A. Yes, sir.

"Q. He issued a bulletin making it your duty to ride in the engine? A. I don't know if he did. I know we were supposed to do it, or had to do it.

Johnson v. Railroad.

"Q. You say there is a bulletin issued that it is the head brakeman's duty to get nineteen orders? A. I don't know if there is a bulletin to that effect or not.

"Q. Then in reference to bulletins you don't mean you got any authority from a bulletin to do those things? A. I merely meant I did as others did, as it was the custom and practice.

"Q. Then it wasn't according to rules, but according to what you considered the custom and practice? A. If each and every employee would live up to the book of rules it would be impossible to move trains from one station to another.

"Q. You think so? A. I know it.

"Q. Then you don't pretend to be governed by the book of rules and the bulletins? A. The book of rules, you are not supposed to live up to every one. It would be impossible to move trains and railroads.

"Q. So you knew when you was riding in the engine that you were violating the rules in the rule book and bulletins? A. I don't; for I had rode on the engine in the presence of officers on the train.

"Q. Who were the officers? A. I don't remember now.

"Q. What about this duty that you allege in your petition and you testify, is your duty to jump off and get that nineteen order? Where do you get that? A. I got it from every other practical railroad man that does it.

"Q. You don't get it from the rules or bulletins? A. As I said before, we don't live up to the book of rules.

"Q. You knew you were not acting according to rules when you jumped off? A. I didn't know I was doing anything contrary.

"Q. Nobody told you to get that nineteen order? A. Nobody told me.

"Q. Did anybody ever tell you to get one? A. Yes, sir; I have been told time and again to catch that order-brakeman, 'catch that order.'

"Q. Volunteered. When you missed it who told you to get off? A. I don't know as I was told at all. I knew it was my duty, and I didn't wait to be told.

"Q. You knew the rules required the engineer to stop if he failed to get the order? A. I knew he was supposed to stop if he failed to get the order. The rules don't require him to stop if I would get off and get the order and deliver it to him—don't require him to stop.

"Q. As I understand you, when you got off on the platform you say your left foot slipped about three feet and there is where your heel caught? A. Yes, sir.

"Q. Tell the jury what kind of place your foot caught—got fast in? A. I couldn't state; but I know the foot was fast; the heel pulled off my left shoe; caught and held me there until I was knocked loose by the train.

"Q. How fast was that train going when you got off? A. About six to eight miles an hour.

"Q. You did know while yet on the engine, and before you got on the platform, it was covered with frost? A. Yes, sir. I discovered that when I got ready to get off, when I swung the lantern to look for trucks or other obstructions."

P. H. Staggs, who examined the platform immediately after the accident, testified as follows: "He lit on his left foot, and the second step there seemed to be kind of a doty place, rotten, you know, like on the edge of the plank where it would rot, and just like as you know it would wear out. I seen where he had stepped, and I tried with my foot to see if a person's heel would catch in it, and it would catch enough to catch a person. He got off about ten feet from this

doty place. I don't know how deep the hole was, but a person's feet could catch in it for I tried it. I know in reason if he hadn't stepped in the hole he would not of fell. I know this because I have gotten off and on trains enough to know in my own judgment."

D. W. Adkinson for plaintiff, testified as follows: Q. "State the condition of the platform of that place before he was hurt? A. Well, the cracks was something like an inch and a half wide, and the boards where the mark stopped was sloped off, it wasn't sound. I took my knife and gouged in it and it wasn't very sound."

I. W. Hurt testified that the platform had rotten places in it; that back from the place where plaintiff's heel struck, for about an inch and a half, the plank was rotten.

It is true the defendant offered several witnesses who contradicted the testimony of the plaintiff regarding his duties, and also contradicted the witnesses who testified for him regarding the condition of the platform. It may be said, however, that all the testimony disclosed that the brakeman were in the habit of receiving No. 19 orders, but the testimony of plaintiff stands alone in support of the proposition that it was his duty to get off the train and get the order and get back on the train while it was in motion.

The defendant did not stand on the rules as printed, but offered several witnesses who testified to the custom and practice in receiving and delivering No. 19 orders.

The appellant claims that its demurrer should have been sustained: (1) That the platform was in a reasonably safe condition; (2) That the plaintiff, at the time he was injured, was disobeying the rules of the company; (3) That he was guilty of contributory negligence, as a matter of law.

In Henry v. Railroad, 109 Mo. 488, 19 S. W. 239, it is said: "A railroad corporation owes to those of its

employees who are engaged in running its trains the duty of great care and vigilance in providing and maintaining a safe and unobstructed track. The care in this particular should be commensurate with the perils the employee would encounter should the company fail in the proper observance of this duty.''

If the plaintiff's testimony is true, then it was his duty to jump on to the platform from moving trains at night, as well as by day, and to again board such trains from such platforms at such times. Service of trainmen, not only while operating trains over the roads, but at station yards, is regarded and recognized as dangerous, even under the most favorable circumstances, and it is incumbent upon the companies to use reasonable care to make the places where they perform their duties, as safe as is consistent with the operation of the roads. In the handling of cars and trains about yards and platforms, the employees necessarily move with quickness and celerity from point to point, and hence, it is quite impossible for them, in every instance, to carefully survey their paths or give close attention to the planting of each foot.

The plaintiff testified that on account of the condition of the platform, the heel of his shoe caught and threw him. There was other testimony to the effect that while there was only a depression of a fourth of an inch, yet the board was rotten, and in such a condition that one's foot might be caught in it. It might be said that so far as ordinary pedestrians are concerned, the proof of such a defect would not make a case, but such a defect in a platform up on which trainmen are required to leap in darkness, and while their trains are in motion, cannot be held reasonably safe as a matter of law.

In Munro v. Railroad, 155 Mo. App. 710, 135 S. W. 1016, the defect in the station platform was somewhat similar to the one at Richland, and the court held that the evidence regarding the same was sufficient to jus-

tify submitting the question of the condition of the
platform to the jury. In that case the plaintiff was
not an employee, but a passenger, and the case was de-
termined by the law governing that relation, but when
we consider that the care required should be commen-
surate with the peril the employee encounters in jump-
ing from moving trains, it may well be said that a plat-
form that was not reasonably safe for a passenger,
would not be reasonably safe for such employee.

In Williams v. Railroad, 119 Mo. 316, 24 S. W.
782, it is said: ''The duty of a railroad company, in
respect to keeping its tracks and grounds in a safe
and suitable condition, must be a relative one, depend-
ent upon the purposes for which they are used, and
the duties required of employees upon them. In yards
where trains are made up and much switching done, and
in which switchmen are constantly exposed to dangers,
a greater degree of care is required than at points on
the road where such duties are rare. The duty of the
master should be measured and determined by the
uses to which premises are applied.''

We are of the opinion that the question whether
the platform was reasonably safe was for the jury.

The next question is: Was the plaintiff injured
while violating the rules of the company? In Mat-
thews v. Railroad, 227 Mo. 241, 126 S. W. 1005, it is
said: ''It is sufficient to say that it is no longer an
open question in this state that, when an employee is
injured in consequence of the violation of the master's
instructions, the law will not permit a recovery, for
the reason that by so doing the servant assumes all
the risks which are incident thereto, and must suffer
without compensation all injuries sustained by him in
consequence of said assumed risks, except in those
cases where the evidence shows that the rules of the
master were being violated by the servant with the

knowledge and consent of the master, or with knowledge and without objection on his part."

The rules prohibited the employees from jumping on or off trains or engines moving at a high rate of speed. There was a conflict in the testimony as to the rate the train was moving. The plaintiff testified that it was moving from eight to ten miles an hour, and the defendant's witness, from twelve to fifteen. And there was also a conflict as to what would be a "high" rate of speed.

In Hurst v. Railroad, 163 Mo. 309, 63 S. W. 695, it is said: "The evidence showed that an experienced brakeman could safely get on the cars in motion while going from ten to twelve miles an hour. . . . The rules of defendant forbade employees 'to board engines or cars while they are in too rapid motion,' thus by implication at least permitting them to do so, when they were not so running."

It is claimed by the defendant that plaintiff should have been riding on top of a box car as the train passed through Richland, and that it was no part of his duties to be in the engine, or to receive the order. Reference to plaintiff's testimony as copied herein, will show that he testified it was the practice of the head brakeman to ride on the engine. In this he was corroborated by some of the defendant's witnesses, who testified that the head brakeman rode a part of the time on the engine, and that they also frequently received the No. 19 order; that sometimes the order was delivered to the engineer, sometimes to the fireman, and sometimes to the head brakeman.

The plaintiff testified further, however, that if he failed to get the order while on the engine, it was his duty to jump off the train, obtain it and get on the train again while it was passing through the station. The only corroboration of his testimony on this point is found in the testimony of Mr. Gorman, the train conductor, who testified as follows, on cross-examina-

tion: "Q. You mean the man that catches at the order will holler if he gets it? A. He says, 'All right.' Q. If he says 'All right' he don't slow up? A. If he don't holler 'All right' he has got to stop. Q. Whoever catches it, brakeman or fireman, signals to him he has it? A. Yes, sir. Q. In case it is lost his practice is to stop? A. Yes, sir. Q. I will ask you if it is not the practice also, and very generally observed, that his train is kept under more control and a man alights and goes off the train and gets an order? A. Yes, sir. Q. And you get yours when the caboose comes by? A. Yes, sir."

If the plaintiff's testimony, to the effect that it was the regular practice and custom for the brakeman to get off the train and get the order and get back on and deliver it to the engineer, is true, then there was some substantial evidence that the rule had been abrogated.

In Barry v. Railroad, 98 Mo. 62, 11 S. W. 308, the rule is stated in the following language: "The position taken by the appellant that Barry should be held guilty of contributory negligence on a demurrer to the evidence because violating rule 41 at the time of the accident, is untenable. If there was an established usage on the part of the defendant's engineers, known and acquiesced in by the superior officers, to allow fireman to make short moves, the engineer not at the time being on the engine, then Barry could not and ought not to be held guilty of contributory negligence. Under these circumstances, the custom would amount to an abandonment of the rule by the defendant to the extent of the custom. But it is further insisted that there is no evidence that the superior officers knew of the existence of such a usage. Knowledge of the usage need not be shown by direct evidence that these officers saw the custom practiced. Notice may be inferred from circumstances. It may be implied from the notoriety of the custom. The evi-

dence in this case tends to show that the usage was well known among the defendant's employees and of long standing, and from this the jury could with propriety infer notice to the defendant's officers.

If we look only to plaintiff's testimony, and we are limited thereto, in discussing the question of a demurrer to his evidence, then under the authority of the case just cited, he was entitled to have the jury say whether the rule was in force, or whether it had been abrogated.

As the plaintiff's testimony showed, that when he cast his light on to the platform, for the purpose of seeing if it was free from obstruction, he saw that it was covered with frost, it is claimed that by jumping from the train on to the platform, he was guilty of such contributory negligence as to preclude a recovery. Had he known that the platform was defective, there would be much force in this contention.

In Brannock v. Railroad, 147 Mo. App. 301, 126 S. W. 552, it is said: "In Lake Erie, etc. Co. v. Craig, the question whether a trainman who was injured by catching his foot in an open frog, had proximately contributed to the accident by needlessly going between cars, was ruled to be for the jury on the ground that if he went between carelessly, nevertheless he did not take the risk of injury from the frog, because he had no notice, actual or constructive, it was open, hence might count on the railway company having complied with its duty to block it. . . . Ability to anticipate by ordinary forethought that harm is likely to result from the wrongful conduct of another, if one does a given careless act, is material on the question of whether said act is superseded as proximate cause of the ensuing harm. If the act of carelessness is performed knowing, or with good reason to know, it exposes the actor to injury from another's tort, and injury follows, the first carelessness remains a concurrent and proximate cause."

In Baird v. Railroad, 61 Iowa 359, 13 N. W. 731, the plaintiff undertook to make a coupling of cars under circumstances more dangerous than usual, and was injured in the attempt, but the court held this fact was not conclusive proof of his contributory negligence. In the course of the opinion the court said: "It is true that the jury in this case found that there was more than usual danger, by reason of the fact that the car to which plaintiff was to couple was not stationary. But their finding must mean, we think, that it was more dangerous than it would have been if the car to which he was to couple had been stationary. The mere fact alone that the car was in motion, regardless of the speed with which it was moving, would not necessarily make the coupling more dangerous than an ordinary one. But if it should be conceded that the jury meant that the coupling in this case, in view of all the circumstances shown, was more dangerous than an ordinary one, it would not necessarily follow that the plaintiff was guilty of contributory negligence. Nearly all employment in making up and running railroad trains is more or less hazardous. In performing a duty which necessarily involves a large hazard, the employee should of course exercise greater care. But we cannot say that the employee might not under some circumstances be justified in taking more than the ordinary risk. Risks differ according to circumstances, and the circumstances are sometimes very complicated, and not always to be apprehended and estimated in a moment by the employee while intent upon the performance of his duty. The ordinary rule is that the employee should exercise such care as a prudent person might reasonably be expected to exercise in view of all the circumstances of the particular case, so far as they are known to him, or are discoverable in the exercise of property diligence.

"The plaintiff was walking westward between the rails, just in advance of the train backing westward,

and close by the drawbar, intending to raise the link so as to effect a coupling when the cars should come together. But seeing that the car to which he was to couple was moving toward him, he concluded not to remain until the cars came together, and attempted to step out. He might and, as the circumstances were, he should have come to this conclusion sooner. Had he done so, he would manifestly have succeeded. But just ahead of him was a ditch which was liable to cause him to stumble, and which did cause him to stumble. Had he seen it, or had he known that there was a ditch there, there would be much ground for contending that he was guilty of contributory negligence. But it does not appear that he saw the ditch, or knew that it was there."

If the appellant knew that its brakeman, in the performance of their duties, were required to jump onto the platform from the train while the latter was in motion, then the condition of its platform was an important factor. And it was bound to know the usual effect of ordinary, natural conditions, and to have contemplated that there might, at times, be frost or ice upon its platform, and that on account thereof, obstructions or defects in its platform might be more dangerous than at other times. [Benedict Pineapple Co. v. Railroad, 46 So. 732, 20 L. R. A. (N. S.) 92, and note thereto.]

The plaintiff was an active young man, twenty-nine years of age, and in possession of all his faculties, and able to take care of himself under any ordinary circumstances, and when these things are all considered, together with the fact that it is not claimed he knew, or would have known by the exercise of ordinary care, of any defect in the platform, we cannot say, as a matter of law, that he was guilty of contributory negligence by jumping from the moving train onto the platform, simply because he knew of the frost.

The appellant says, however, that the plaintiff knowingly selected a dangerous way, when a safer one was apparent to him, and on account thereof, was guilty of contributory negligence. The evidence does disclose that if for any reason the train crew failed to get the No. 19 order, it was the duty of the engineer to stop the train and get the order, and it is the contention of the appellant that when the respondent saw frost on the platform, that he was then given the option to jump from the train or wait for it to stop, and as he voluntarily chose the former, he assumed all the risks relating thereto. This rule is declared in Moore v. Railroad, 146 Mo. 572, 48 S. W. 487, and is a familiar one, based on common sense, as no employee who knowingly selected a dangerous way when a safer one was apparent to him, has any right to hold the master for damages because he was injured while voluntarily doing an act which he knew was dangerous, when at the same time a safe way was open to him. This question, however, like nearly every other question of negligence, is seldom one of law.

In Florida R. R. Co. v. Mooney, 24 So. 148, it is said: "If, in the performance of his duties, two or more methods are open to him, and he has no instructions to pursue one in particular, he necessarily must choose between them, and he cannot be said to have been negligent if he in good faith adopts that which is more hazardous than another, provided the one pursued be one which reasonable and prudent persons would adopt under like circumstances. Any other rule would require the servant to be measured by the standard of very prudent persons, for only extremely cautious persons ordinarily adopt the least hazardous course where both are considered safe and appropriate. For this reason it cannot be held, as a matter of law, that, in all cases where a servant is injured while pursuing a method voluntarily adopted by him, more hazardous than other available methods, he is guilty

of contributory negligence, for nonconstat the method
pursued may be one which prudent persons would or-
dinarily exercise under like circumstances.'' To the
same effect is the case of Brady v. Railroad, 206 Mo.
509, 102 S. W. 978.

In Albion v. Hetrick, 90 Ind. 545, 46 Am. Rep. 230,
it is said: ''It is only when the standard of duty is
fixed and certain, or where the measure of duty is de-
fined by law, . . . or when the negligence is so
clear and palpable that no verdict could make it other-
wise, that the question of negligence becomes one of
law, and not of fact.'' And the rule is thoroughly es-
tablished in this state that the question of negligence
is one of fact where reasonable minds might differ as
to the ultimate inference to be drawn. And it may
also be said that judges are not supposed to know
anything more about the proper manner of perform-
ing the brakeman's duty than jurors. For this court
to say, as a matter of law, that the plaintiff was guilty
of contributory negligence, such as to preclude a re-
covery because he jumped onto the platform under the
circumstances, would, in our opinion, be usurping the
province of the jury.

The second assignment of error relates to the ac-
tion of the court in admitting certain testimony. Omer
Shelley, a witness for plaintiff, testified that in Sep-
tember, October and the first part of November, 1910,
there were several broken places, holes and rotten
boards in the platform. The objection was made that
the testimony did not prove the condition of the plat-
form at the time and place of the injury. The wit-
ness further testified that he did not recall the con-
dition of the platform where plaintiff claimed he was
injured, and that he did not know whether at such
place there were any broken boards or holes in the
platform. He also testified that at a point about 150
feet east of the depot, there were three new boards
in the platform.

I. W. Hurt testified that about a week or ten days after the accident, he removed from the platform at the point where plaintiff was injured, some of the boards, and there were rotten places in them; that at the place where plaintiff's heel struck, the plank was rotten, and this rotten place was right where the plaintiff's heel or something had struck.

D. W. Adkinson testified that in October and November he examined the platform, and that some of the boards had rotten edges and there were a few that had been spliced. This testimony was also objected to on the ground that defendant did not confine the inquiry as to the condition of the platform to the time and place of the injury. The witness further testified that he was at the platform the next morning and saw where a man had slipped, and also saw the blood, and that the frost was still on the platform, and from the marks and blood he knew where the plaintiff had fallen and that at such point the plank was not sound.

The objection made to the testimony of the witness, Hurt, was that it related to repairs made subsequent to the time of the injury, and that it was not shown that at the time said repairs were made the platform was in the condition it was in at the time of the alleged injury. The court ruled that testimony that the platform was repaired after the injury, was not admissible, and struck out that part of the questions and answers of the witness tending to show that boards were replaced, leaving the balance of the testimony remaining.

It may be conceded that testimony of subsequent repairs is not admissible to show negligence at the time of the injury. [Alcorn v. Railroad, 108 Mo. 81, 18 S. W. 188.] And the record discloses that the trial court was so governed in its ruling. It must be remembered however, that it was the claim of plaintiff that the board was rotten at the time he was injured,

164 App.—40

and testimony that it was taken up a week afterwards and was rotten at that time, was evidence that it was rotten at the time plaintiff was injured. [Swadley v. Railroad, 118 Mo. 268, 24 S. W. 140; Landers v. Railroad, 156 Mo. App. 580, 137 S. W. 605.]

In the Swadley case the plaintiff claimed the defendant was guilty of negligence in permitting rotten and decayed ties to remain in its roadbed. A witness testified that he examined the ties about the first of August, and they were rotten, and the injury occurred the first of the following September. In sustaining the trial court in admitting the testimony, Judge BLACK said: It was not necessary that the witnesses should be able to speak of the condition of the ties on that very day. Evidence of the condition of the ties within a reasonable time before or after the accident was competent. The limitation to such evidence is that it must be such, in character and point of time, as to justify the inference that the ties were in a bad condition at the time of the accident." The court cited, in support of its opinion, Stewart v. Everts, 44 Am. and Eng. R. R. Cases, 313, wherein it was held that evidence, that when the road was repaired six months after the accident, it was found that the ties were in such a state of decay as to fairly lead to the conclusion that they were in a decayed state when the accident happened, was admissible.

While the testimony of the witness, Shelley, was objectionable, for the reason that he did not testify to the condition of the platform at the point plaintiff was injured, yet he did testify that he did not know its condition at that point, but testified that for sometime previous to the time plaintiff was injured, there were rotten or decayed places in the platform. The instructions only submitted to the jury the condition of the platform at the very point complained of by plaintiff, and we do not see how the testimony could in anywise have affected the verdict.

The last assignment relates to the action of the court in giving plaintiff's instruction No. 7. The part of the instruction complained of, reads: "The court instructs the jury that, in the absence of knowledge to the contrary, the plaintiff had the right to presume that the platform, at the place where he alighted, was in a reasonably safe condition for him to alight thereon, from said train, while the same was in motion, for the purpose of securing said order, provided you find the securing of said order, under the circumstances, as shown you by the evidence, was in accordance with and within the line of his duties under his said employment."

The objection to the instruction is, that plaintiff was a witness in his own behalf, and testified to the conditions that surrounded him at the time he alighted on the platform, and with this testimony it was error for the court to tell the jury that notwithstanding such knowledge, he could disregard it and lean on the presumption that the platform was safe.

Counsel cite Mockowik v. Railroad, 196 Mo. 550, 94 S. W. 256, in support of their position. In that case Judge LAMM said: "But will the law indulge presumptions where all parties to the actual occurrence are alive and go upon the stand and the facts are fully disclosed? If plaintiff knew of the ordinances and relied on the fact that defendant was obeying their provisions and acted on that reliance, could he not have said so? Under such conditions, reliance would seem to be a fact susceptible of proof as are other facts, and should be proved by the best evidence of which the case would admit. That presumptions have no place in the presence of the actual facts disclosed to the jury, or where plaintiff should have known the facts had he exercised ordinary care, is held in many cases."

It will be noticed that the court did not tell the jury in instruction No. 7, that the plaintiff had the

right to presume that the platform was in a reasonably safe condition, but "that in the absence of knowledge to the contrary, the plaintiff had the right to presume," etc. In the Mockowik case the court further said: "It may be said this is not a case where the accident happened in the nighttime and where plaintiff could not see and advise himself by the exercise of ordinary care of the presence, let alone the speed of the engine."

In Heberling v. Warrensburg, 204 Mo. 604, 103 S. W. 36, the court said: "If plaintiff knew of the unsafe condition of the sidewalk at the point where the accident occurred, he had no right to presume that it was in a condition reasonably safe for the use of the public." In the same case the court quoted from Coffey v. Carthage, 186 Mo. 585, 85 S. W. 532, as follows: "If plaintiff had no knowledge of the defect or hole in the sidewalk, then she had the right to assume that the sidewalk was in a reasonably safe condition," and approved this declaration in the following language: "This is, we think, a correct statement of the law."

The case of Heberling v. Warrensburg is a later case than Mockowik v. Railroad, and expressly holds that it is not the duty of a person traveling on a public street to examine it for defects, but he may act upon the presumption that it is reasonably safe. The same rule must be applied in an action by the servant against the master. In fact, no other rule would be reasonable. The instruction is fully supported by Coffey v. Carthage, and Heberling v. Warrensburg.

Appellant also contends that the instruction told the jury that plaintiff had the right to presume that the ice and frost he saw on the platform were not slick and would not cause him to slip and fall. We do not believe the instruction is subject to this criticism, for the reason that it only permitted plaintiff to rely on presumption when he had no knowledge to the con-

trary, and the evidence showed conclusively that plaintiff did know of the ice and snow, and therefore, it cannot be said that the instruction authorized the plaintiff to presume the ice and snow were not slick and would not cause him to slip and fall. It appears to us that the part of the instruction objected to referred only to the condition of the platform complained of by plaintiff, and did not refer to ice or snow at all.

In behalf of the defendant the jurors were told that plaintiff could not recover unless he had shown by the greater weight or preponderance of the evidence that there was a hole or decayed place in the platform, and that such hole or decayed place caused him to fall by reason of his heel catching therein. And if the jury were unable to determine from the evidence whether his fall was caused by reason of his heel catching in a hole or decayed place, or from slipping on a frosted platform, or from any other cause, the verdict must be for the defendant, and if the jury found that the platform was covered with frost and on account thereof, was slippery, and that when plaintiff alighted from the engine upon the platform, he slipped and his slipping caused him to fall and receive his injuries, he was not entitled to recover.

Having examined the assignment of errors, and determined them against the appellant, it is our duty to affirm the judgment, and the same is accordingly done. All concur.